# CRITIQUE OF A STUDY CONDUCTED BY HAL PORET IN THE MATTER OF NAIL ALLIANCE, LLC v. POLY-GEL, LLC

## COMMISSIONED BY
## HOVEY WILLIAMS LLP

### NOVEMBER 2018

**RL A**SSOCIATES

601 EWING STREET SUITE A-11
PRINCETON, NEW JERSEY 08540
(609) 683-9200
(609) 683-0855 FAX

## Background

RL Associates was recently contacted by Hovey Williams, LLP, and informed that their client, Poly-Gel LLC ("Poly-Gel") was involved in litigation against Nail Alliance, LLC, and Hand & Nail Luxury, Inc., (together, "Nail Alliance") over the use of the name Poly-Gel.

We were informed that, since at least 1999, Poly-Gel has manufactured, marketed and sold several lines of gel-based products that are primarily related to the retail healthcare and cosmetic fields. According to the home page of Poly-Gel's website,[1] Poly-Gel's current product lines are geared to foot care, skin care (including for hands and feet), hot and cold therapy, and bracing and support.[2] Each of these lines is marketed in various ways, including under its own brand name and in combination with the Poly-Gel mark. We were informed that Poly-Gel's products are sold both to healthcare professionals and to the general retail purchasing public through brick and mortar stores, consumer catalogs, and on-line retailers such as Amazon.com.

We were also informed that Nail Alliance manufactures, markets, and sells a variety of nail care products under the name Gelish PolyGel.[3] According to the Complaint filed in this case, Nail Alliance's products are allegedly intended to be marketed and sold to salons and licensed nail technicians, and, at this time, are not intended for sale directly to end users.[4] Also according to the Complaint, Nail Alliance registered the name PolyGel for a variety of cosmetics products in 2017.

We were informed that Nail Alliance brought suit against Poly-Gel claiming either that there is no legally meaningful likelihood of confusion based on the two companies' use of the term PolyGel or, if there is confusion, then Poly-Gel is infringing on Nail Alliance's registration of PolyGel for cosmetics products.[5] Nail Alliance retained the survey expert Hal Poret ("Poret") to conduct a study to provide evidence in support of its specific claim that there is no legally

---

[1] www.polygel.com
[2] One additional Poly-Gel product line is geared to arts and education.
[3] On Nail Alliance's website, www.gelish.com, sometimes the terms Gelish and PolyGel appear together, and sometimes each of them appears by itself.
[4] We note, however, that it is possible to purchase Nail Alliance's Gelish PolyGel products through third party sellers at Amazon.com.
[5] We were also informed that Poly-Gel filed a counterclaim, arguing that there is likely to be a legally meaningful likelihood of consumer confusion based on the use of the term Poly-Gel by the two companies.

meaningful likelihood of confusion. Hovey Williams retained RL Associates to review and critique the Poret study. This report presents our critique.

## Overview of Our Critique of the Poret Study

Our critique is organized as follows. First, we will present a brief review of the Poret study, which will include what he was assigned to do, what he did, and what he claims he made. Next, in that light, we will discuss what aspect of this case we believe the Poret survey is actually relevant to. Finally, we will explain why we think the evidence provided by the Poret study is simply NOT relevant to what we understand to be the real issue in this case.

## The Poret Survey

a) Poret's Assignment

Poret describes the study he conducted in a report titled "Expert Report of Hal Poret in Matter of Nail Alliance, LLC v. Poly-Gel, LLC: Surveys to Assess Whether Purchasers of Professional Nail Treatment Products are Likely to Confuse Gelish PolyGel Nail Treatment Products with Counterclaim-Plaintiff's PolyGel Mark or Counter-Plaintiff's Products."

At the outset of his report, Poret describes his assignment as follows:

> Counsel for [Nail Alliance] retained me to design and conduct a survey to assess the extent to which, if at all, prospective purchasers of [Nail Alliance's] professional nail treatment products that use the term POLYGEL are likely to confuse such products with [Poly-Gel's] POLYGEL mark, including to assess whether nail care professionals are even aware of [Poly-Gel's] mark or products (since [Nail Alliance's] prospective customers could not confuse [Nail Alliance's] products with [Poly-Gel] if they are not even aware of [Poly-Gel's] mark or products).[6]

b) Poret's Survey

Poret conducted an on-line survey of 200 respondents who <u>he defined</u> as "prospective purchasers of professional nail treatment products – namely, nail salon owners / managers / employees, nail technicians, and others who work in a business that does nail treatments." The respondents were shown a photo of a set of Gelish nail treatment products, four of which included the term PolyGel, and asked the following series of questions:

---

[6] For ease of reading, we have replaced Poret's use of the terms "Counter-Plaintiff" and "Counter-Defendant" with the names of the actual companies.

- *What company or brand do you think makes or puts out the products you were just shown, if you have an opinion?*

- *Do you think that the products you were just shown are sponsored or approved by, or affiliated with, any other company or brand?[7]*

- *Are you aware of any other products or brands that you think are made or put out by the same company as the products we showed you?*

- *Are you aware of any other products that use the term PolyGel?*

c) What Poret Claimed as the Evidence Produced By His Survey
Based on respondents' answers to these questions, Poret concludes that:

> [T]he survey showed a 0% confusion rate and a 0% rate of awareness of [Poly-Gel's] POLYGEL mark among nail care professionals. Accordingly, the survey demonstrates that nail care professionals are not likely to be confused by [Nail Alliance's] GELISH products that use the term POLYGEL, as such nail care professionals do not associate the term POLYGEL with [Poly-Gel] or any of [Poly-Gel's] products and would not make any mistaken mental connection to [Poly-Gel's] use of the mark POLYGEL.

## Our Critique of the Poret Survey

Our critique of the Poret Survey focuses on numerous issues that we believe completely destroy the evidentiary value of the survey Poret conducted, specifically, the universe he chose to interview and the interviewing approach he implemented. But first, we begin with a brief discussion of the difficulty of the assignment Poret was commissioned to do.

a) The Difficulty of Proving a Negative
The assignment that Poret was given was to see if there was evidence that would "prove a negative;" that is, to show that a legally meaningful level of confusion will <u>not</u> occur. While, in general, we believe that there is no way to use survey evidence to definitively prove that confusion will never exist under any set of circumstances, we do believe that a carefully designed study can provide significant evidence that can illuminate the issues that are raised in a case, even one that calls for proving a negative. One mark of such a study is that, when the study is designed, the decisions that are made are conservative (from the point of view of the party claiming that confusion will not exist), in order to strengthen the evidence that the study

---

[7] For this and the following two questions, respondents were asked appropriate follow-up questions; e.g., *You answered that you think that the products you were just shown are sponsored or approved by, or affiliated with, another company or brand. What other company or brand?*

provides. We strongly believe that, in this case, the decisions that were made by Poret were NOT conservative, from the point of view of Nail Alliance.

b) Why We Believe the Poret Survey Tested the WRONG Universes With the Wrong Approach
As presented in Paragraph 23 of the counterclaims made by Poly-Gel, a key aspect of the potential likelihood of confusion arising from Nail Alliance's use of the term PolyGel is initial interest confusion, and in particular, initial interest confusion on the part of several different groups of people including general public retail purchasers, health care professionals, and nail care professionals that may arise when they see "side by side" advertisements for both Poly-Gel and Nail Alliance marketing their related goods.[8]

We think it is realistic to believe that members of each of these groups, and especially doctors and other health care professionals such as dermatologists who deal with nail care issues, are likely to pay attention to advertising for any nail care products at least initially, that is, at least until they have actually read the ad or product label. That is, the most likely initial interest confusion in these circumstances involves either a user or a health care professional reading an ad or seeing other promotional material (such as a label), about a product with the same basic name (Poly-Gel) as a product that bears some similarity to a product the respondent has used. In our opinion, the Poret survey did not interview any of these groups using an appropriate approach, and particularly did not appropriately interview appropriate health care or nail care professionals. Thus, in our opinion, Poret did not conduct appropriate interviews with the people most likely to be subject to the relevant "initial interest confusion." Accordingly, we believe that this is one key reason why the Poret survey does not provide useful evidence in this case.

c) Why We Believe the Poret Survey Used the Wrong Approach
As discussed above, Nail Alliance acknowledges at numerous times in its Complaint that the issue at the heart of this case is likelihood of confusion; (e.g., in Paragraph 13 of the Complaint, "…[Nail Alliance] does not believe there is a likelihood of confusion between [Nail Alliance's] registered trademark and [Poly-Gel's] trade name…"). Poret, in discussing his assignment, also seems to be in agreement that likelihood of confusion is what is at issue. But Poret does not test for that likelihood. He shows respondents a photo of a set of Gelish nail treatment products, and

---

[8] Hovey Williams provided us with several examples of third party publications that show Gelish PolyGel next to the type of products that Poly-Gel manufactures and sells.

asks a series of questions that do no more than gauge whether anyone mentions Poly-Gel. We believe that there are circumstances when such an approach can be useful, especially when the products are well known and/or top-of-mind. When a survey researcher is assigned to prove the negative that confusion does not exist, such an approach is wholly inadequate.

Poret completely neglects to address what happens when a person who is familiar with a product from one company subsequently comes into contact with a product from another company. On page 4 of the Poret Survey, Poret states, "…[Nail Alliance's] prospective customers could not confuse [Nail Alliance's] products with [Poly-Gel] if they are not even aware of [Poly-Gel's] mark or products." On the following page of the report, he goes on to claim that "the survey demonstrates that nail care professionals are not likely to be confused by [Nail Alliance's] GELISH products that use the term POLYGEL, as such nail care professionals do not associate the term POLYGEL with [Poly-Gel] or any of [Poly-Gel's] products and would not make any mistaken mental connection to [Poly-Gel's] use of the mark POLYGEL."

But we believe these statements are not true, because they neglect to deal with what would happen when a prospective customer <u>is made aware</u> of Poly-Gel's mark or products. We believe that such situations are sufficiently likely that they must be considered within the realm of the survey. For instance, what would happen when a health care professional who uses or recommends Poly-Gel's products encounters Gelish PolyGel products, in advertisements, on-line, or in-person? Or what would happen when a person who has been provided a brace by her physical therapist encounters Gelish PolyGel products at her nail salon? Or, what would happen when someone purchases a Poly-Gel product after having a treatment at a spa and then goes to have her nails done at the same spa? The Poret Survey has absolutely nothing to say about these and other possible real world scenarios involving the potential purchasers or users of the products at issue. We emphasize that, in fact, respondents in the Poret Survey were <u>never</u> shown any of Poly-Gel's products at all.

## Conclusion

We believe that, since both the universe Poret chose and the interviewing approach he implemented do not adequately address the central issues at the heart of this matter, Poret's survey does NOT provide any legally meaningful evidence concerning either the existence or

non-existence of whether there might be a likelihood of confusion as to the source of two companies' products that are both sold under the term Poly-Gel.

### **Personnel and Remuneration**

Michael Rappeport was responsible for writing this critique. Dr. Rappeport's resume, including cases and publications, is attached as Appendix A.

RL Associates is being compensated $21,200 for this critique. Dr. Rappeport's hourly compensation rate for time spent subsequent to this report is $800/hour.

_[signature]_  November 1, 2018
Michael Rappeport

APPENDIX A

RESUME OF MICHAEL RAPPEPORT

# DR. MICHAEL RAPPEPORT

Dr. Rappeport has worked in market and survey research areas for more than 40 years, the last 38 as a partner of R L Associates. As part of his function he has made more than 200 appearances as an expert witness in legal cases at trial and/or through deposition. His testimony has dealt with statistics and statistical analysis, marketing, and public opinion in cases in such disparate areas as trademark infringement, libel, damages for failure to fulfill a contract, and reapportionment. He has also testified as an expert in a number of quasi-legal proceedings before a range of public boards, agencies and regulatory bodies.

Education
B.S. Physics, RPI, Troy, New York 1957
M.S. Electrical Engineering, Yale University, New Haven 1958
PH.D. Statistics, New York University, 1968

Professional positions
1975 - present: Founding partner, R L Associates, survey research and consulting firm

> Dr. Rappeport has had wide experience both in the direction of all kinds of surveys of human populations and as a consultant in statistical, strategy planning and survey research areas. Two areas in which he has been particularly active are studies on public policy, and studies for use in litigation. Along with responsibility for the management of the firm, Dr. Rappeport has direct responsibility for all statistical aspects of the firm's work. In the main this encompasses sample design and the use of a wide variety of statistical analysis techniques. He has designed projectable national and regional probability samples of all civilian non-institutional telephone households, and a very wide range of specialized samples of all types.

1969 - 1972; 1973 - 1975: Vice president and chief statistician, Opinion Research Corporation, Princeton, New Jersey

1972 - 1973: Vice president, Response Analysis Corp. Princeton, New Jersey

1959 - 1969: Supervisor, Bell Telephone Laboratories, Holmdel, New Jersey

Teaching
At various times, Dr. Rappeport has taught or conducted guest lectures in a number of colleges and universities. He has been an adjunct instructor in both Research Methods and Political Public Opinion at Rutgers University, and taught a course in Marketing at Rider College.

Articles and Speeches
Over the course of the last 25 years, Dr. Rappeport has written approximately 40 published articles, and given more than 70 speeches. He has spoken at a number of meetings of legal organizations including:

    Witness at a mock trial at April 2010 Meeting – American Bar Association Antitrust Section
    Panel Member – Annual meeting Antitrust Section of ABA – March 2009
    Faculty member – ABA-ALI seminar on Dilution – February 2004
    Participation in a 2003 panel of the Amer. Intellectual Property Law Assoc.
    Participation in a 2001 panel of the Advanced Practitioners Prog of the Intl. Trademark Assoc.
    A 1998 speech to the Bar for the Federal Circuit
    Witness at a mock trial at the Feb. 1998 Meeting – American Bar Association Antitrust Section
    A 1996 speech to the New Jersey Intellectual Property chapter of the Inns of Court
    A 1995 panel presentation for the CLE program, American Bar Assoc. – Antitrust Section
    A 1995 speech to the CLE program, American Bar Assoc. – Intellectual Property Section
    Witness at a mock trial at the 1995 meeting of the American Intellectual Property Law Assoc.

Among the wide cross-section of other types of organizations where he has spoken at an annual or other major meeting are Planned Parenthood Federation of America, United States Trademark Association, Travel and Tourism Research Association, Newspaper Research Council, Pennsylvania Hospital Association, and New Jersey Political Science Association.

Other
Dr. Rappeport is currently listed in Who's Who in America, and several other similar publications dealing with the Legal Profession, Social Sciences and Marketing. He has served on a variety of civic and professional boards. Among those most directly related to his professional activities:
Editorial Board of the "Trademark Reporter" 1993-1996, 1997-2004
Board of Advisors - Citizens Committee on Bio-Medical Ethics 1986-1994
Board of Directors, American Association for Public Opinion Research, 1976-1980; Standards
      Chairman, 1979-1980

Cases in which Michael Rappeport has appeared either by deposition or in trial as an expert witness 2013-2018. Date shown is first appearance. Unless noted all cases listed were in United States District Courts.

2018
August Deposition – Boltex Manufacturing and Weldbend v Galperti – Southern District of Texas
May Deposition – Dentsply International v Dental Brands for Less – Southern District of New York

2017
October Deposition – CaféX Communications v Amazon Web Services – Southern District of New York
October Deposition – Toyo Tire v Atturo Tire – Northern District of Illinois
August Deposition – HealthPartners v Wal-Mart and Sam's West – District of Minnesota
July Deposition – Mars v J. M. Smucker – Eastern District of Virginia
June Deposition – Trevor Singleton v Fifth Generation – Northern District of New York
March Deposition – Capital Health et al v Horizon – Superior Court of New Jersey

2016
October Deposition – Toyo Tire v CIA Wheel Group – Central District of California
September Deposition – Dropbox v Thru – Northern District of California
July Deposition – Ass Armor v Under Armour – Southern District of Florida
June Deposition – Morton & Bassett v Organic Spices – Northern District of California
May Deposition and March 2017 Trial – Coty et al v Excell Brands – Southern District of New York

2015
October Deposition – Flowers Bakeries v Earthgrains Baking Companies – Middle District of Georgia
September Deposition and June 2017 Trial – Koninklijke Philips v Hunt Control Systems – District of NJ
July Deposition – Goya v Golla Oy – District of Puerto Rico
April Deposition and May Trial – NFP v Paycom – Northern District of Illinois

2014
November Deposition – Innovative Ventures v Green Planet – Eastern District of Michigan
August Deposition – Tory Burch v Lin & J International – Southern District of New York
May Trial – Kind v Clif Bar – Southern District of New York
March Deposition – American Pro International v American DJ Supply – Southern District of Florida
March Deposition – UltimatePointer v Nintendo – Eastern District of Texas
January Deposition – Dynamic Housewares v QVC et al – Eastern District of Pennsylvania

2013
Sept Deposition – Individual Plaintiffs v Beam Spirits and Skinnygirl Cocktails – Northern Dist Illinois
March Deposition – Louisiana Fish Fry v Bruce Foods – Middle District of Louisiana

List of publications of Michael Rappeport 1992-2018

Design Issues for Controls – Trademark and Deceptive Advertising Surveys: Law, Science, and Design; edited by Shari Seidman Diamond and Jerre B. Swann (American Bar Association, Section of Intellectual Property Law, 2012)

A Replication Problem in Survey Design, including a Critique of the Decision in Thoip v. Disney – Trademark Reporter; November-December 2010

Response to Survey Methodology Articles – Trademark Reporter; May-June 2006

The Democratic Ethos and the Positive Sum Society – Society; July-August 2003

A Rejoinder to a Critique – The Trademark Reporter; November-December 2002

Litigation Surveys - Social Science as Evidence – The Trademark Reporter; July-August 2002

Applying Daubert – National Law Journal; January 21, 2002

When Consumer Beliefs are Based on a Court's Intuition - One More Issue Arising From Conopco (with Sandra Kornstein-Cohen) – The Trademark Reporter; March-April 1997

Is Judaism Splitting Into Two religions – Sh'ma; April 1996

The Role of the Survey "Expert" - A Response to Judge Posner – The Trademark Reporter; March-April 1995

The Future of the American Jewish Community – Sh'ma; December 1994

The Patient Self Determination Act: Implementation of the Law in Nursing Homes (co-author) – Paper presented at the 122nd Annual Meeting of the American Public Health Association; November 1994

Condition Critical (co-author) – Paper presented at the 1994 Annual Meeting of the American Society of Law, Medicine and Ethics; October 1994

Statistically Based Evidence – National Law Journal, Op-Ed Page; August 1993

Prognosis Good for Lower Medical Care Inflation – Wall Street Journal Op-Ed page; February, 1993

Predicting the Election - Why Clinton Will Win – The Sunday Record (Bergen County, New Jersey); August 1992. In addition Dr. Rappeport was a columnist on a weekly basis for the Bergen Record throughout much of 1991. Columns dealt with a wide range of statistical and public opinion issues from crime in New Jersey to the proper reporting of retail sales.