# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| NAIL ALLIANCE, LLC, a Delaware<br>    limited liability company, and | ) | |
| | ) | |
| HAND & NAIL HARMONY, INC.,<br>    a California corporation, | ) | |
| | ) | |
|     Plaintiffs/Counterclaimant-<br>        Defendants, | ) | |
|     v. | ) | Case No. 17-CV-01026-FJG |
| | ) | **\*FILED UNDER SEAL\*** |
| POLY-GEL L.L.C., a New Jersey limited<br>    liability company; and DOES<br>    1 through 100, inclusive, | ) | |
| | ) | |
|     Defendant/Counterclaimant-<br>        Plaintiff. | ) | |

# ORDER

Pending before the Court are (1) Counterclaim-Defendants Nail Alliance, LLC and Hand & Nail Harmony, Inc.'s (hereafter, collectively "Nail Alliance") Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Doc. No. 141); (2) Defendant Poly-Gel L.L.C.'s (hereafter "Poly-Gel") Motion for Partial Summary Judgment (Doc. No. 143); and (3) Defendant Poly-Gel's Motion for Leave to File Supplemental Exhibit (Doc. No. 159). As an initial matter, the motion for leave to file supplemental exhibit is **DENIED** for the reasons stated in Nail Alliance's opposition. The Court now turns to the motions for summary judgment.

## I.    Background

Nail Alliance filed this action on December 11, 2017. Nail Alliance filed its second amended complaint (which is now the operative complaint) on November 16, 2018. Nail Alliance is a nail products company. Nail Alliance primarily sells its products through

stores and distributors catering to salons. Defendant Poly-Gel is a medical products company, which, among other things, manufactures arch supports and orthotics.

This action involves two similarly-named products/companies. Nail Alliance's complaint alleges that Nail Alliance had obtained a trademark registration for its new product line, POLYGEL, which covered nail care kits, lotions, skin scrubs, and nail enamel; the US Patent & Trademark Office ("USPTO") issued the registration on July 4, 2017, after no opposition was filed, noting that prior uses of the term "POLYGEL" (including defendant's) were not likely to cause confusion in the marketplace. Nail Alliance seeks a declaratory judgment of no likelihood of confusion, premised on Nail Alliance's assertion that there would be no risk of confusion between Nail Alliance customers (salons and licensed technicians) and Poly-Gel's customers (healthcare professionals and purchasers of medical-related products). In response, Poly-Gel asserted that a likelihood of confusion exists. Poly-Gel also asserted counterclaims against Nail Alliance and Nail Harmony for (1) trademark infringement under the Lanham Act; (2) initial interest confusion; (3) cancellation of a registered trademark; (4) state-law dilution; and (5) state-law unfair competition.

Nail Alliance moves for summary judgment, or in the alternative, partial summary judgment, requesting that the Court find that Poly-Gel cannot establish the elements of its counterclaims, or that an affirmative defense defeats each of the counterclaims. Poly-Gel also moves for partial summary judgment, requesting the Court grant summary judgment to Poly-Gel on its affirmative defense that it has priority in the trademark rights of the term POLYGEL.

II. **Facts**

A. **Nail Alliance**

In 2009, Danny Haile ("Haile") founded Nail Harmony to manufacture nail products, including GELISH brand gel polish. In 2011, Haile and his partners Gari-Dawn Tingler ("Tingler") and David Daniel ("Daniel") created Nail Alliance as a holding company of the brands Nail Harmony manufactured and sold. Nail Harmony's products appear to be popular within the professional nail products industry.

Among Haile's products was a new professional artificial nail treatment for nail extensions and damaged nails. Haile conceived of the mark POLYGEL for this artificial nail treatment and its trial or starter kits. Haile did not know of the Poly-Gel company or its different brands or products prior to conceiving of the POLYGEL name. Haile directed Nail Alliance's Chief Operations Officer to file a trademark application for POLYGEL. Nail Alliance employees (a) conducted a search of the USPTO records for POLYGEL, (b) reviewed Poly-Gel's registration for POLYGEL, U.S. Registration No. 3,728,933 and saw that it covered wearable medical devices in Class 10, (c) conducted a search for the POLYGEL mark on Google and Amazon and did not find any use of POLYGEL for nail products or cosmetics, (d) reviewed Poly-Gel's website, <polygel.com>, saw medical claims, and did not see cosmetics, and (e) came to the conclusion that the mark was free to adopt and use for nail products and cosmetics. Nail Alliance was unable to secure the POLYGEL Facebook account and <polygel.com> domain name, because it was already the URL for Poly-Gel's website and account name for Poly-Gel's Facebook page.

On May 16, 2016, Steve Malynn was authorized to file a trademark application with the U.S. Patent and Trademark Office, for POLYGEL, to be used on or in connection with:

> Cosmetics; Non-medicated nail and skin care preparations; Beauty supplies, namely, nail care kits composed primarily of cuticle oil, UV top coat, nail primer, nail dehydrator, and also containing assorted nail files and nail buffers, acrylic nail sculpting forms, acrylic sculpting nail brush and instruction booklet; Hand and body lotion; Skin scrub; Nail enamel.

The U.S. Patent and Trademark Office ("USPTO") granted Nail Alliance's trademark application for POLYGEL in International Class 3, without opposition and without prior registrations — including any owned by Poly-Gel — being cited against the application, and assigned Registration No. 5,238,109 to Nail Alliance, which registration has a constructive first use date of May 16, 2016 (15 U.S.C. 1057(c)). The European Union Intellectual Property Office ("EUIPO") granted, without opposition, Nail Alliance's application for POLYGEL in Intellectual Class 3, and assigned Registration No. 1360930 to Nail Alliance. On or about March 1, 2017, Nail Alliance began to ship, promote and sell professional nail products under the GELISH POLYGEL marks.

Nail Alliance asserts that professional nail technicians and salon owners are its targeted purchasers of GELISH POLYGEL artificial nail treatments. Poly-Gel, however, argues that in addition to nail technicians and salon owners, Nail Alliance markets its products directly to consumers, noting that certain products are available on Amazon.com and that Nail Alliance advertises and provides educational training through social media channels, such as Facebook, Instagram, and Twitter. Nail Alliance's POLYGEL kits range in price from $65 to $200, and its recommended LED lamp for use with the kits is $250. Nail Alliance also licenses the POLYGEL mark to two affiliated entities who sell ENTITY STUDIO ONE CONTOURING GEL with POLYGEL® TECHNOLOGY and ARTISTIC PUTTY® POLYGEL® NAIL ENHANCEMENT alone and in kits under the marks displayed in Nail Alliance's brief.

GELISH POLYGEL is sold through the largest distributor of professional beauty products in the United States, Beauty Systems Group — Sally Beauty Holdings, Inc. ("BSG"), which owns (a) Cosmo Prof professional beauty supply stores and (b) the Armstrong McCall franchise of locally owned professional beauty supply stores, both of which require proof of a professional license to purchase professional beauty products at

4

the stores.  ARTISTIC PUTTY is sold through the second largest distributor of professional beauty products in the United States, SalonCentric, Inc. ("SalonCentric"), which owns (a) SalonCentric professional beauty supply stores and (b) the State Beauty/RDA Pro Mart store franchise of locally owned professional beauty supply stores, both of which require proof of a professional license to purchase professional beauty products at the stores. GELISH POLYGEL, ARTISTIC PUTTY and ENTITY STUDIO ONE are also sold through a network of professional nail product distributors, including and, in particular, distributors who cater to Vietnamese and Korean owned salons, and these distributors are contracted to require proof of license to purchase these professional nail products, and contractually agree not to sell these products at third-party websites and Internet marketplaces.  In addition, GELISH POLYGEL, ARTISTIC PUTTY and ENTITY STUDIO ONE are sold in online marketplaces, independent distributors, and in product catalogs.  Nail Alliance asserts that its products are not meant to be sold to customers who are not professional nail salons; Poly-Gel, however, argues that Nail Alliance has not effectively limited purchasers to just to professional nail salon market.

### B.    Poly-Gel

Poly-Gel is a New Jersey limited liability company formed in February 1999, which manufactures and sells medical, health and well-being products in the form of functional apparel, molds and devices, some of which are sold by prescription and have medical reimbursement codes.  Poly-Gel also manufactures and sells what it calls cosmetics and skin care products for the hands, feet, and nails, some of which have been deemed fashionable and were marketed as hydrating beauty products. Barbieri Dec. ¶ 3 (see Exhibit 1, Bickel Depo 1, 204:18-206:9).[1]  Poly-Gel does not make products for nail

---

[1] Poly-Gel's moisturizing products that it sells directly to the public do not appear to be lotions; rather, these products are gloves and slippers which contain polymer gels that

5

Case 4:17-cv-01026-FJG   Document 162   Filed 09/27/19   Page 5 of 25

technicians to use at work on clientele; Poly-Gel, however, asserts that certain of its products (such as moisturizing gloves and slippers) are positioned as spa products, and may be sold to extend the life of a manicure or pedicure.  Poly-Gel has never made and would not make an artificial nail enhancement product.

Poly-Gel has been an exhibitor at tradeshows for medical products but has never had a booth and been an exhibitor at tradeshows for professional beauty products. Poly-Gel's Executive Vice President Peter Bickel and President Larry Kerson have attended certain beauty products trade shows, despite not having booths at such shows.  Poly-Gel is not aware of any of its products being sold in any stores owned or franchised by BSG or SalonCentric, or any master distributors that cater to local Vietnamese or Korean owned salons. Instead, Poly-Gel has sold its products through, among other distributors, Ulta, Home Shopping Network, Costco, CVS, Walgreens, Walmart, T.J. Maxx, LTD Commodities, and London Drug.

Poly-Gel's NATRACURE booties and mittens cost between $9.99 and $29.99. Poly-Gel sells products in four ways: (1) private labeling; (2) catalog sales; (3) retail brick-and-mortar stores; and (4) internet sales. Although Poly-Gel asserts that its products have been continuously sold under the POLYGEL trademark and trade name for many years prior to Nail Alliance's use of the trade name and trademark, there is little evidence presented demonstrating that Poly-Gel's trade name or trademark was used in the consumer marketplace or that consumers have an awareness of Poly-Gel's trademark; instead, it appears that many of its products have been sold by third parties under those parties' private brands or under Poly-Gel's NATRACURE brand.  See Deposition of Joey Weikal at 64:11-65:10, 75:10-15, Doc. No. 142-16.

---

have moisturizing properties.  See, e.g., Poly-Gel's internet site, www.Natracure.com.

Poly-Gel owns the following United States trademark registrations and pending application for POLYGEL®: (1) POLYGEL Reg. No. 3728933 Arch supports for boots or shoes; orthotic inserts, namely, insoles, half insoles, heel inserts in the nature of heel liners, and shoe inserts for primarily orthopedic purposes in the nature of forefoot cushions, heel pads and heel cushions, shoe padding, ball of foot cushions, and heel pieces for shoes; orthopedic supports, namely, heel protectors, in Class 10; and (2) POLYGEL Serial No. 88112184 Gloves, wraps, caps, and sleeves impregnated with moisturizing preparations for the hands, feet, fingernails and toenails, in Class 3. Notably, Poly-Gel's trademark application Serial No. 88112184 was filed on September 11, 2018 (after Nail Alliance's trademark application in Class 3 had already been approved). The USPTO Examiner approved Poly-Gel's Class 3 Trademark Application for products impregnated with moisturizing preparations for the hands and feet and nails and did not find any likelihood of confusion with Nail Alliance's prior Class 3 Trademark Registration. See Doc. No. 142-22.

### C. Likelihood of Consumer Confusion

Poly-Gel did not produce in discovery any direct survey evidence of any likelihood of confusion. Nail Alliance's expert, Hal Poret, provided a survey of licensed nail professionals (who are asserted to be the consumer audience of Nail Alliance's products), finding that there is no likelihood of confusion as to the source or origin of GELISH POLYGEL artificial nail treatment products. Poly-Gel's website (www.natracure.com) from which consumers can purchase products does not use Poly-Gel's corporate name at the point-of-sale, and makes no trademark use of the name on the website.

Instead of providing survey evidence, Poly-Gel provides the Court with anecdotal stories about consumer confusion. On September 12, 2017 (approximately 6 months after Nail Alliance began using the term PolyGel to advertise its products), Poly-Gel

7

received an email from Amazon, wherein Amazon suggested Poly-Gel, in addition to selling its own products, should consider selling three Nail Harmony products through the Amazon marketplace.[2]  About a year later, on September 20, 2018, one of Poly-Gel's Quality Assurance employees received a phone call through Poly-Gel's switchboard from someone who purported to be an independent nail technician who wanted to troubleshoot a problem she was having with Nail Alliance's PolyGel product, a product that was brought to her by a new customer.[3] Poly-Gel also produced emails, dated beyond the discovery cut-off, from marketing or manufacturing executives mistakenly attempting to provide nail products or services to Poly-Gel.[4]

### D.    Monetary Relief

Nail Alliance does not seek monetary relief; instead, it seeks a declaratory judgment.  Poly-Gel, although ostensibly seeking monetary relief, provided no expert report or other computation of monetary damages during the discovery period.  Poly-Gel did not file a motion to compel discovery, despite stating in its Amended Rule 26 Disclosures: "Poly-Gel has not computed the damages it has suffered and continues to suffer based on its claims. Poly-Gel anticipates that its damages calculation will require discovery from Nail Alliance and Hand & Nail Harmony and its customers, sales agents, and distributors, and will be the subject of expert opinion disclosed at the time set for such disclosures under the Court's Scheduling and Trial Order."

---

[2] Nail Alliance notes that a mistake by Amazon's computer algorithm is not evidence of consumer confusion or transfer of consumer goodwill.

[3] Nail Alliance notes that evidence of this phone call is both inadmissible hearsay and immaterial as it is not evidence of (a) a consumer purchasing a product by mistake, or (b) any transfer of consumer goodwill from Poly-Gel to Nail Alliance.  Instead, if anything, this is merely evidence of an inadvertent mistake.

[4] Again, Nail Alliance notes that these emails constitute inadmissible hearsay, and at best demonstrate evidence of an inadvertent mistake.

8

### E. Injunctive Relief

Nail Alliance does not seek injunctive relief against Poly-Gel. On October 12, 2017, Poly-Gel elected not to seek injunctive relief against Nail Alliance's continued use of the POLYGEL mark to promote and sell nail products but elected instead to file a petition for cancellation before the Trademark Trial & Appeal Board, which does not have power to issue injunctive relief. Additionally, when it initiated its suit against Nail Alliance, Poly-Gel did not seek preliminary injunctive relief the District of New Jersey. To-date, Poly-Gel has not sought preliminary injunctive relief in this Court, and Nail Alliance has been allowed to continue to use the POLYGEL mark to promote and sell nail products since commencement of this action.

## III. Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–90 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586–90.

A nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

> The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

9

<u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citations and quotations omitted).

## IV.    Analysis

### A.    Poly-Gel's Motion for Partial Summary Judgment (Doc. No. 143)

Poly-Gel moves for partial summary judgment, requesting that this Court find that Poly-Gel has priority in the trademark rights of POLYGEL.  Poly-Gel argues that prior to 2016, it was already using (and has continuously used) its trade name and the POLYGEL trademark on a variety of products, including certain skin care and cosmetic products. Poly-Gel argues that Nail Alliance began using the same mark, POLYGEL, no earlier than January 2016, and therefore Poly-Gel has priority over Nail Alliance in the use of the trademark and trade name.

While it is true that the Lanham Act prohibits registration of a trademark that so resembles "a mark or trade name previously used in the United States by another" if the junior user's mark is likely to cause confusion or mistake when used on or in connection with goods identified in the application (<u>see</u> 15 U.S.C. § 1052(d)), the Court finds that Poly-Gel has only demonstrated that it used the name POLYGEL prior to Nail Alliance. This fact, standing alone, is not useful in determining whether the use by Poly-Gel was as a trademark or trade name (rather than a corporate name of which consumers had no knowledge) such that the introduction of Nail Alliance's product would cause consumer confusion.  <u>See ZW USA, Inc. v. PWD Sys., LLC</u>, 889 F.3d 441, 446 (8th Cir. 2018) (finding that long or continuous use of a name or mark is not probative evidence of goodwill, because it "says little about 'minds of consumers,' which is the relevant unit of analysis for likelihood of confusion").  Poly-Gel's motion, moreover, does not provide the Court with a basis for determining the relevant universe of consumers to consider when

examining consumer goodwill.  Poly-Gel's motion for partial summary judgment on the issue of priority, therefore, is **DENIED.**

**B.    Nail Alliance's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Doc. No. 141)**

Nail Alliance argues that summary judgment should be entered in its favor on Poly-Gel's counterclaim because Poly-Gel cannot establish the elements of its counterclaims for trademark infringement and unfair competition, as (1) Nail Alliance has prior and superior trademark rights under First Bank v. First Bank Sys., Inc., 84 F.3d 1040 (8th Cir. 1996), (2) the six factors that the Eighth Circuit set forth in SquirtCo. v. Seven-Up Co., 628 F.2d 1086 (8th Cir. 1980) weigh strongly in Nail Harmony's favor and against any finding of a likelihood of confusion, and (3) Poly-Gel has set forth no probative evidence supporting a claim for monetary relief or for a permanent injunction.  In addition, Nail Alliance argues as to the remaining counts of Poly-Gel's counterclaim that (1) Poly-Gel's cause of action for initial interest confusion fails because the Eighth Circuit does not recognize such a cause of action; (2)  Poly-Gel is not entitled to an order canceling Nail Alliance's trademark registration because there is no likelihood of confusion; (3) Poly-Gel cannot establish the elements required to prove state-law dilution, and even if it could, such a claim is preempted by federal law; and (4) the elements of the remaining counts pled in Poly-Gel's counterclaim are substantially similar to those already addressed, and summary judgment should be granted in Nail Alliance's favor as to the entire counterclaim.  The Court examines each of these arguments, below.

**1.    Count I of the Counterclaim – Unfair Competition, Lanham Act**

Poly-Gel, as plaintiff to the counterclaim, has the "ultimate burden of proof in [this] infringement action." Gen. Mills, Inc. v. Kellogg Co., 824 F.2d 622, 626 (8th Cir.1987). Poly-Gel must meet three elements to succeed on its claim: (1) a superior trademark right

11

in its corporate name prior to Nail-Alliance's registered trademark rights in the POLYGEL mark; (2) a substantial likelihood of confusion among consumers; and (3) grounds for monetary or injunctive relief. First Bank v. First Bank Sys., Inc., 84 F.3d 1040, 1044 (8th Cir. 1996).  The Court considers each of these elements, below.

### a.    Superior Trademark Rights

Nail Alliance argues that it has superior trademark rights in the POLYGEL mark. Under Eighth Circuit law, "the owner of a trademark may not 'monopolize markets that his trade has never reached and where the mark signifies not his goods but those of another.'" Nat'l Ass'n for Healthcare Commc'ns, Inc. v. Cent. Arkansas Area Agency on Aging, Inc., 257 F.3d 732, 735 (8th Cir. 2001) (quoting Hanover Star Milling, 240 U.S. 403, 416 (1916)).  Instead, "[t]o acquire ownership of a trademark, one must actually use the designation in the marketplace as a mark in the sale of goods or services." 1 McCarthy on Trademarks and Unfair Competition § 6:3 (5th ed.). If a name or mark has no "drawing power" or "commercial magnetism," there is no trademark right to protect. Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 205 (1942).

Nail Alliance argues that it has a priority date of May 16, 2016, the date of its trademark registration.  It argues that Poly-Gel did not make prior trademark use of its corporate name prior to May 16, 2016 that would overcome Nail Alliance's registered trademark rights in the market for professional nail products.  Instead, Nail Alliance indicates that Poly-Gel's use of the POLYGEL mark prior to May 16, 2016 was simply as a descriptive company name and as a description of the polymer gel which was a component of all its products.  Nail Alliance notes that its customers are nail salon owners and technicians who purchase nail products as part of their services for clientele.[5]  Poly-

---

[5] Poly-Gel makes much of the fact that Nail Alliance's POLYGEL products are also available on Amazon, such that persons other than nail salon owners could purchase

Gel, however, does not sell its products in the same way as Nail Alliance; instead, it sells its apparel, molds or devices in four ways: (1) private labeling; (2) catalog sales; (3) retail brick-and-mortar stores; and (4) internet sales. To the extent that Poly-Gel sells retail products, those are sold through a separate website, www.natracure.com , which does not make use of the Poly-Gel tradename. Moreover, to the extent that Poly-Gel argues that ownership of the domain name "polygel.com" constitutes trademark use, that argument is belied by Carey Licensing, Inc. v. Erlich, 627 F. Supp. 2d 1029, 1037 (E.D. Mo. 2007) (holding that "Courts applying the Lanham Act to cases involving domain name registration have universally held that ownership, without more, does not constitute [trademark] use.").

Nail Alliance compares this case to First Bank v. First Bank Sys., Inc., 84 F.3d 1040 (8th Cir. 1996), where the Eighth Circuit affirmed the district court's denial of permanent injunctive relief. The Eighth Circuit found that the plaintiff, who held only a common law trademark, cold not establish prior trademark rights to the owner of the registered mark, because "[i]n order to qualify for trademark protection, . . . [the mark] must distinctly identify [the plaintiff] as the provider of certain banking services in the minds of consumers." Id. at 1044-45. Here, Nail Alliance argues that Poly-Gel is unable to demonstrate that consumers identify it as the maker of POLYGEL branded products, given the name's lack of penetration in the relevant marketplace.

In response, Poly-Gel argues (as it did in its own motion for partial summary judgment) that it has continuously and prominently used the POLYGEL trade name and trademark for years prior to Nail Alliance's use. Poly-Gel, however, does not demonstrate that its prior use was trademark or trade name use. For instance, Poly-Gel points to

them. This fact does not negate the fact that Nail Alliance's product uses the trademark POLYGEL in its advertising directed at consumers of nail products.

13

documents using the POLYGEL name, such as inventory history records, sales presentation materials, etc. But these uses seem more in the nature of the use of a corporate name, and do not prove that consumers associate the name with a particular product. Poly-Gel also argues that the professional nail products market is too narrow of a category of product to compare; instead, Poly-Gel argues that both it and Nail Harmony should be considered manufacturers of cosmetic products, which Poly-Gel asserts it has sold since 2006. However, as noted by Nail Alliance in its reply, even if both companies are considered to be cosmetics companies, Poly-Gel has provided no evidence that consumers are aware of Poly-Gel's corporate name or see it at the point of sale. Nor has Poly-Gel provided the Court with examples of trademark use of the name such as branded labeling used in retail beauty products supply stores.

The Court finds that Poly-Gel has not demonstrated superior trademark rights. It has failed to provide the Court with evidence supporting its claim that its use of the name "POLYGEL" has resulted in "drawing power" or "commercial magnetism" sufficient to qualify for trademark protection. Therefore, summary judgment is granted on Count I of the counterclaim on the basis of failure to demonstrate superior trademark rights.

### b. Likelihood of Confusion

In the alternative, the Court also considers whether Poly-Gel can demonstrate likelihood of confusion. To survive summary judgment, a plaintiff must present probative evidence that there is a "probability" of confusion, "not merely a possibility," Lovely Skin, Inc. v. Ishtar Skin Care Prod., LLC, 745 F.3d 877, 887 (8th Cir. 2014). To examine likelihood of confusion, courts in the Eighth Circuit "consider the following six factors from SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir.1980): "(1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged

14

infringer's intent to 'pass off' its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase." <u>Lovely Skin, Inc.</u>, 745 F.3d at 887. No one factor is determinative; instead, summary judgment is appropriate where a "majority of the <u>Squirtco</u> factors weigh against a likelihood of confusion." <u>Davis v. Walt Disney Co.</u>, 430 F.3d 901, 905 (8th Cir. 2005). Additionally, in the Eighth Circuit, there are three typical evidentiary routes to establish likelihood of confusion: (1) survey evidence; (2) evidence of actual confusion; and (3) argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace. <u>Heartland Bank v. Heartland Home Fin., Inc.</u>, 335 F.3d 810, 821 (8th Cir. 2003) (concurring opinion, quoting <u>McCarthy</u> § 23:63).

With respect to the three evidentiary routes to demonstrating likelihood of confusion, Poly-Gel has presented a fairly weak case. Notably, the only survey evidence presented by the parties is Nail Alliance's expert report of Hal Poret, finding no likelihood of confusion when surveying 200 consumers of professional nail products. Although Poly-Gel criticizes Nail Alliance's expert report, it did not present its own expert evidence finding likelihood of confusion. With respect to evidence of actual confusion, Poly-Gel has pointed to anecdotal evidence of a few of Nail Alliance's customers or vendors contacting Poly-Gel accidentally. This type of anecdotal evidence has been repeatedly found wanting by courts when examining actual confusion. <u>See</u> <u>Nautilus Grp., Inc. v. ICON Health and Fitness, Inc.</u>, 372 F.3d 1330, 1338 (Fed.Cir.2004) (four misdirected phone calls out of thousands is "relatively small number" and is "too unreliable to establish actual confusion"); <u>Gruner + Jahr USA Pub. v. Meredith Corp.</u>, 991 F.2d 1072, 1079 (2d Cir. 1993) (finding that customer inquiries should more likely be considered as demonstrating questions about possible relationship between parties, not evidence of actual confusion); <u>Door Sys., Inc. v. Pro–Line Door Sys., Inc.</u>, 83 F.3d 169, 173 (7th Cir.1996) ("[T]he

15

plaintiff's evidence that two consumers (out of how many thousands?) may have been misled cannot by itself be thought to create a contestable issue of likelihood of confusion even if the evidence, which is hearsay, is admissible and credible, as we doubt.").  The only viable route for Poly-Gel to show likelihood of confusion, then, is a showing through inferential, circumstantial evidence that the ordinary consumer in the marketplace would be confused.  See Heartland Bank, 335 F.3d at 821-22.  The Court will now turn to the Squirtco factors to determine whether such a showing has been made.

i.      The strength of the owner's mark

Nail Alliance argues that Poly-Gel's name is weak, both conceptually and commercially.  See Lovely Skin, Inc., LLC, 745 F.3d at 888 (noting that both conceptual and commercial weakness are considered).

Nail Alliance first argues the name is conceptually weak because it is nothing more than the combination of "poly" and "gel" to represent a common feature (polymer gel) in all its products.  See, e.g., ZW USA, Inc. v. PWD Sys., LLC, 889 F.3d 441, 446 (8th Cir. 2018) (finding ONEPUL mark conceptually weak because "[i]t is, after all, little more than a misspelling of 'one-pull'"); see also Lovely Skin, Inc., 745 F.3d at 888 (finding that the LOVELY SKIN mark is descriptive and weak). In response, Poly-Gel argues that its name is suggestive rather than descriptive and should be afforded a higher level of protection. See Duluth News-Tribune, 84 F.3d at 1096 (noting that trademarks are classified into four categories:  (1) arbitrary or fanciful (deserving the highest level of protection); (2) suggestive; (3) descriptive; and (4) generic (deserving the least level of protection)). In reply, Nail Alliance indicates that even if this Court assumed that the name was suggestive rather than descriptive, the analysis does not end.  Instead, the Court looks to whether the mark is commercially weak.

16

Nail Alliance also argues the name is commercially weak, as there is no evidence that the name has widespread commercial recognition. Typically, plaintiffs present survey evidence to show that its mark is recognized by consumers. <u>Lovely Skin</u>, 745 F.3d at 888 ("Lovely Skin presented no direct evidence, such as consumer surveys or consumer testimony, to demonstrate that its marks enjoy strong secondary meaning."); <u>Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.</u>, 426 F.3d 1001, 1005 (8th Cir. 2005) ("[D]irect evidence such as consumer testimony or surveys are most probative of secondary meaning."). Nail Alliance further notes that there is no evidence that Poly-Gel's corporate name has any goodwill among consumers in the retail cosmetics market.

Here, even assuming that the name Poly-Gel is suggestive rather than descriptive, the Court finds that the name is commercially weak and that Poly-Gel has not presented evidence demonstrating that its name has commercial goodwill in the relevant cosmetics market. This factor weighs in favor of Nail Alliance.

ii.     Similarity between the owner's mark and the alleged infringer's mark

Nail Alliance argues that consumers are unlikely to confuse its use of the name POLYGEL with Poly-Gel's use of the name because (1) the parties use different brand names to promote their products; and (2) the parties use different and distinct trade dresses to further distinguish their products. With respect to the first argument, Nail Alliance notes that when a company name is used with a mark, it "significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products." <u>Nabisco, Inc. v. Warner-Lambert Co.</u>, 220 F.3d 43, 46 (2d Cir. 2000) (comparing "DENTYNE ICE" with "ICE BREAKERS" brands). Here, Nail Alliance's packaging uses the brand name "GELISH" above and in close proximity to the POLYGEL trademark. Poly-Gel's packaging for its direct-to-consumer products, by contrast, uses

17

the "NATRACURE" mark at the top of its package inserts, and the notice "by POLYGEL" in smaller typeface and design. Nail Alliance also notes that the parties use distinct trade dresses – with Nail Alliance using a stylized GELISH mark that is larger than and directly on top of the POLYGEL mark; the "GEL" element of the "POLYGEL" mark in bold; and the actual color of the nail treatment emphasized below the stylized sphere. Poly-Gel's trade dress includes: white and green packaging; a stylized NATRACURE mark in proximity to a leaf-and-droplet-of-water design; a picture of the product; a small "by POLYGEL" design manufacturer notice, which emphasizes the POLY syllable in bold with a stylized halo; and a reference to Poly-Gel's direct-to-consumer www.natracure.com website. Nail Alliance asserts that no reasonable consumer would look at Nail Alliance's packaging and mistakenly believe that the product's source is Poly-Gel.

In response, Poly-Gel argues that the trademarks at issue are not similar – instead, they are identical, POLYGEL. Poly-Gel also notes that the registered mark is not "GELISH POLYGEL," but rather is "POLYGEL" alone. Poly-Gel further notes that the Eighth Circuit has held that "[w]hen identical marks are used in the same geographic area for the same class of goods or services,[6] likelihood of confusion is presumed." Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church, 634 F.3d 1005, 1010 (8th Cir. 2011) (quoting Solutech, Inc. v. Solutech Consulting Servs., 153 F. Supp. 2d 1082, 1088 (E.D. Mo. 2000)). Poly-Gel further distinguishes the "DENTYNE ICE" line of cases, noting that the term" ICE" is conceptually weak as opposed to the term "POLYGEL." Poly-Gel further argues that the issue of trade dress is a red herring.

---

[6] The Court notes it is questionable under the facts of this case whether Poly-Gel used the term POLYGEL in the same class of goods or services as Nail Alliance.

Case 4:17-cv-01026-FJG   Document 162   Filed 09/27/19   Page 18 of 25

Given that the mark "POLYGEL" is the same for both parties and viewing the facts in the light most favorable to the non-moving party, the Court finds that this issue weighs slightly in favor of Poly-Gel.[7]

iii.   The degree to which the products compete with each other

Nail Alliance argues that the parties' underlying products do not compete with one another in the marketplace.  Nail Alliance asserts that it operates within the professional nail salon industry, and its customers consist mainly of companies and individuals who apply nail treatments (rather than individuals who receive nail treatments). Poly-Gel, on the other hand, sells products to consumers of medical, health, and well-being products, and several of its products use medical reimbursement codes.  Nail Alliance and Poly-Gel do not sell their products at the same brick-and-mortar stores, and the only marketplace in which the products might be found together is an online marketplace, like Amazon.com.   To the extent that Poly-Gel argues that consumers in the online marketplace might be confused, Nail Alliance notes that other courts have found that consumers are able to distinguish different, non-competing products in the marketplace. Multi Time Mach., Inc. v. Amazon.com, Inc., 804 F.3d 930, 932, 935-36 (9th Cir. 2015); Groupion, LLC v. Groupon, 859 F.Supp.2d 1067, 1079 (E.D. Cal. 2012); Hasbro, Inc. v. Clue Computing, Inc., 66 F. Supp. 2d 117, 123 (D. Mass. 1999), aff'd, 232 F.3d 1 (1st Cir. 2000).

---

[7] The Court's determination that one of the Squirtco factors weighs in favor of Poly-Gel does not mean that Poly-Gel has demonstrated a likelihood of confusion sufficient to withstand summary judgment, however.  See., e.g., Hasbro, Inc. v. Clue Computing, Inc., 66 F.Supp.2d 117, 122 (D. Mass. 1999) (finding, where the marks are identical, that the "similarity of the marks here will not be decisive if other factors indicate a lack of confusion").

19

Poly-Gel responds that the parties' respective products are substantially related and compete within the cosmetics industry. Poly-Gel argues that cosmetic nail products and skin care products are considered related goods within the industry.[8] Poly-Gel also argues that not all of Nail Alliance's purchasers are licensed nail professionals, and therefore the possibility of consumer confusion would be greater.

The Court finds this factor weighs in Nail Alliance's favor. There is no evidence that both parties' products are sold in the same brick-and-mortar stores. Nor is there evidence that Poly-Gel sells its branded product in any retail beauty stores. For the reasons stated by Nail Alliance, the products are not competitive, and this factor does not support any likelihood of consumer confusion.

> iv. The alleged infringer's intent to 'pass off' its goods as those of the trademark owner

Nail Alliance argues that its founder came up with the name POLYGEL prior to ever hearing of the company Poly-Gel. Before applying to register this mark, Nail Alliance confirmed there was no prior registration for POLYGEL in International Class 3 and did not discover any cosmetic products being sold under this mark. Nail Alliance argues that Poly-Gel has no evidence that Nail Alliance intended to copy Poly-Gel's name, and further notes that such copying would not be beneficial to Nail Alliance in any event because Poly-Gel's corporate name has no goodwill in the professional nail products market.

Although Poly-Gel argues that Nail Alliance knew about Poly-Gel's use of the name prior to registering the trademark, that is not evidence that Nail Alliance intended to pass off its goods as those of Poly-Gel. This factor weighs in favor of Nail Alliance.

---

[8] Poly-Gel provides no expert evidence supporting this point. Given that the connection between Nail Alliance's artificial nail products and Poly-Gel's gel insoles and gloves are not readily apparent to this Court (or a reasonable observer), it seems that expert support would be needed for such a claim.

As discussed above, the anecdotal evidence of actual confusion presented by Poly-Gel is insufficient to show actual confusion.  This factor weighs in favor of Nail Alliance.

vi.     The type of product, its costs and conditions of purchase

Nail Alliance argues that any likelihood of confusion in this case is belied by the different types of products sold by each party.  Nail Alliance indicates that its artificial nail treatments are expensive, sold to licensed nail technicians, and require specialized training and equipment to use properly.  Further, Nail Alliance notes that Poly-Gel's online listings generally include the NATRACURE product name only, without referring to Poly-Gel, which also makes confusion between the products unlikely.  Nail Alliance therefore argues that the degree of care exercised by normal consumers would eliminate the risk of confusion.  SquirtCo, 628 F.2d at 1091.

In response, Poly-Gel argues that its products and Nail Alliance's products are both inexpensive, can be purchased online, and that Nail Alliance cannot demonstrate that all its purchasers are licensed nail technicians as opposed to "do-it-yourself-ers." However, whether certain do-it-yourself-ers use Nail Alliance's products or not, it is clear that the types of products in this case (nail treatments vs. treated gel insoles or gloves) are quite different and unlikely to be confused with one another – particularly considering that Poly-Gel's online product listings generally include the NATRACURE name only. This factor weighs in favor of Nail Alliance.

vii.     Totality of the Squirtco factors

21

Given that nearly all of the <u>Squirtco</u> factors weigh in favor of Nail Alliance, for the foregoing reasons, Poly-Gel is unable to demonstrate a likelihood of confusion sufficient to withstand summary judgment.

### c.   Entitlement to Monetary or Injunctive Relief

In the alternative, the Court considers whether Poly-Gel can meet the third element of its Lanham Act claim:  entitlement to relief, either monetary or injunctive.  Nail Alliance asserts that Poly-Gel is entitled to neither form of relief.

### i.   Monetary Relief

To show entitlement to damages under the Lanham Act, the plaintiff must demonstrate a likelihood of confusion (which, as stated above, Poly-Gel is unable to show). To show an entitlement to disgorgement of profits, the plaintiff must prove willful infringement.  <u>See</u> <u>Masters v. UHS of Delaware, Inc.</u>, 631 F.3d 464, 471 n.2 (8th Cir. 2011) (acknowledging circuit split, but assuming willful infringement is prerequisite for disgorgement damages); <u>see also</u> <u>Hanesbrand, Inc. v. Seduzione Leggs, LLC</u>, Case No. 4:11-CV-00569-BCW, 2015 WL 12781218, at *2 (W.D. Mo. Feb. 6, 2015) (assuming willful infringement is prerequisite for disgorgement).  Here, Nail Alliance argues that Poly-Gel can show neither actual confusion nor willful infringement, as demonstrated above in relation to the <u>Squirtco</u> factors.  Moreover, Poly-Gel has not provided an expert report or other documentation supporting the amount of monetary relief sought.  Poly-Gel did not provide a computation of damages in its Rule 26 disclosures either.  Thus, because Poly-Gel has not disclosed evidence supporting its claim for monetary damages, Nail Alliance argues that summary judgment is appropriate.  <u>See</u> <u>Carmody v. Kansas City Bd. of Police Comm'rs</u>, 713 F.3d 401, 405 (8th Cir. 2013).

In response, Poly-Gel argues that the Court has wide discretion in determining monetary remedies, including attorneys' fees, for Lanham Act violations.  <u>Metric &</u>

Multistandard Components Corp. v. Metric's, Inc., 635 F.2d 710, 715 (8th Cir. 1980). Poly-Gel further argues that there is willful infringement here, entitling Poly-Gel to Nail Alliance's profits on its use of the term POLYGEL.  Poly-Gel also argues that it may be entitled to its attorneys' fees as it takes that position that this case is an "exceptional case" under the Lanham Act.  Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014).

Upon its review, the Court finds that Poly-Gel's claims for monetary damages are unsupported by the record, both because (1) Poly-Gel has provided no calculation of damages or expert report supporting damages during discovery, and (2) Poly-Gel has failed to demonstrate actual confusion or willful infringement.  This is not an "exceptional case" under the Lanham Act.  Nail Alliance's motion for summary judgment is granted as to all claims for monetary damages.

ii. Poly-Gel is Not Entitled to Injunctive Relief

Nail Alliance argues that Poly-Gel cannot demonstrate entitlement to injunctive relief, as even if it could meet its burden to demonstrate success on the merits, it requires a showing of: (1) irreparable harm; (2) the balance of hardships weighing in its favor; and (3) public policy supporting a permanent injunction. Free and Fair Election Fund v. Mo. Ethics Com'n, 252 F. Supp. 3d 723, 737 (W.D. Mo. 2017). Here, Nail Alliance argues that (1) there is no irreparable harm, as Poly-Gel delayed in seeking injunctive relief; (2) the balance of the hardships tips in favor of Nail Harmony, which has created a successful brand and has been using the mark for the past two years; and (3) public policy disfavors an injunction where, as here, Poly-Gel did not obtain a U.S. trademark registration in International Class 3 prior to Nail Alliance obtaining such a trademark. Poly-Gel, in response, does not challenge Nail Alliance's arguments regarding injunctive relief.

Accordingly, Poly-Gel's motion for summary judgment as to claims for injunctive relief is **GRANTED.**

### 2. Count II of the Counterclaim for Initial Interest Confusion

Nail Alliance notes that the Eighth Circuit has not adopted initial interest confusion as a cause of action. See Sensient Technologies Corp. v. SensoryEffects Flavor Co., 613 F.3d 754, 766 (8th Cir. 2010). In its suggestions in opposition, Poly-Gel does not address the arguments that such a claim does not exist under Eighth Circuit law. Therefore, Nail Alliance's motion for summary judgment as to Count II of the Counterclaim is **GRANTED.**

### 3. Count III of the Counterclaim for Cancellation of Nail Alliance's Registration of POLYGEL

Given that Poly-Gel cannot demonstrate priority of its mark, consumer confusion, or damages, the Court finds no grounds upon which to cancel Nail Alliance's mark. Nail Alliance's motion is therefore **GRANTED** as to Count III.

### 4. Count IV of the Counterclaim for State Law Dilution

Nail Alliance argues that Count IV should be dismissed because (1) federal law preempts these claims; (2) Poly-Gel is unable to show that its corporate name is strong and subject to dilution (see Hallmark Cards, Inc. v. Hallmark Dodge, Inc., 634 F. Supp. 990, 998 (W.D. Mo. 1986)); (3) Poly-Gel cannot prove a "likelihood of dilution of the distinctive quality of [Poly-Gel's] mark," Sensient Technologies Corp., 613 F.3d at 769; and (4) there is no evidence of a redressable injury. In response, Poly-Gel argues that its state and federal claims require the same findings. As this Court has found that Poly-Gel's federal claims fail, so must it find that Poly-Gel's state claims fail. Accordingly, summary judgment is granted in Nail Alliance's favor on Count IV of the counterclaim.

### 5. Counts V-VI of the Counterclaim for Common Law Unfair Competition and Trade Name Infringement

Nail Alliance indicates that Poly-Gel's common law unfair competition and trade name infringement counts contain the same elements as Poly-Gel's other claims, and therefore fail for the same reasons. See Sensient Technologies Corp., 613 F.3d at 763 n.3. In response, Poly-Gel again argues that its state and federal claims require the same findings. Given that Poly-Gel's other claims have all been dismissed, the Court finds summary judgment in Nail Alliance's favor must be entered on Counts V and VI of the counterclaim as well.

## V. Conclusion

For the foregoing reasons, (1) Nail Alliance's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Doc. No. 141) is **GRANTED**; (2) Poly-Gel's Motion for Partial Summary Judgment (Doc. No. 143) is **DENIED**; and (3) Poly-Gel's Motion for Leave to File Supplemental Exhibit (Doc. No. 159) is **DENIED**. Furthermore, given that Nail Alliance's complaint (Doc. No. 107) seeks a declaratory judgment of no likelihood of confusion, the Court believes that given its findings, above, that declaratory judgment in favor of Nail Alliance is warranted. The Court, therefore, enters judgment in favor of Nail Alliance on all claims and counterclaims in this lawsuit.

**IT IS SO ORDERED.**

Date: September 27, 2019          **/S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri            Fernando J. Gaitan, Jr.
                                 United States District Judge